𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

WARWICK COUNTY v. CITY OF NEWPORT NEWS;
WARWICK COUNTY AND COMMONWEALTH OF VIRGINIA
v. OLD DOMINION LAND CO;
WARWICK COUNTY AND COMMONWEALTH OF VIRGINIA
v. NEWPORT NEWS LIGHT AND WATER COMPANY.*

January 16, 1930.

Absent, Chichester, J.

*See *York County* v. *City of Newport News, post,* page 824, 151 S. E. 428.

The opinion states the case.

*Phil. St. George Willcox, Chas. C. Berkeley* and *Meriwether I. Armistead*, for the plaintiffs in error.

*McMurran & Murray, R. M. Lett* and *S. R. Buxton*, for the defendants in error.

PRENTIS, C. J., delivered the opinion of the court.

These are three motions made under sections 2385, 2386 and 2389 of the Code of 1919, as amended by Acts 1926, chapter 353, for redress against the erroneous assessment of State taxes, local taxes and levies. By consent they have been heard together.

The pleadings are quite formal, which is unnecessary under these statutes. There were petitions, demurrers and answers, to which we shall not again refer. The important questions of law presented must be determined from the conceded facts disclosed by the record, with scant attention to the precise form of the pleadings.

The Newport News Light and Water Company had supplied the city of Newport News and much of the adjacent territory with water for a number of years. By deed effective June 30, 1926, the city of Newport News purchased the entire water works plant together with certain lands thereto appurtenant, and since then has operated it as a unified system. There are three reservoirs in the system, designated as the Lee Hall reservoir, Skiff's Creek reservoir (both of which are located in Warwick county), and Harwood's Mill reservoir (located in York county), and it is said that these three constitute practically the only available water supply on the "Peninsula," except the Chickahominy river, about fifty miles distant from Newport

News. Warwick county adjoins the city on the north, Elizabeth City county adjoins it on the east, and the villages of Morrison, Hilton Village and North Newport News are located in Warwick county, while the city of Hampton and town of Phoebus are located in Elizabeth City county. Prior to the purchase of the property by the city, all of these communities were served with water by the Newport News Light and Water Company, and since the purchase have been supplied from the same sources of supply and system by the city of Newport News.

The city had been given authority by its charter, by the general law, and by act of 1926 (Acts 1926, page 880, chapter 530), to acquire, own and operate a water works system. Code, section 3017 (Acts 1908, page 586), which was amended, Acts 1918, page 465, authorizes cities to acquire water works systems operating in territory contiguous to the city, with power to operate, maintain and extend the same in all territories in which the plant purchased had the right to operate, and the later act makes it mandatory upon the city, after such purchase, to supply water to consumers in such contiguous territory. In addition to these powers, there was this further legislation (Acts 1926, page 880, chapter 530), which is copied in the margin.*

This act, it will be observed, specifically authorizes the city of Newport News to purchase the water works

---

*Chapter 530.—An act to authorize the city of Newport News to purchase the water works plant or system now operated by the Newport News Light and Water Company, including the water sheds and appurtenances to said water works plant, and to operate, control, extend, and improve said plant for the purpose of supplying water to the inhabitants of York county, James City county, Warwick county, Elizabeth City county, the city of Hampton, the town of Phoebus, the village of Kecoughtan, and certain areas and properties owned by the United States, to authorize the issuance of bonds of said city for said purposes; to provide

plant or system then owned and operated by the Newport News Light and Water Company (including auxiliary property owned by the Old Dominion Land Company * * *) embracing the reservoirs known as Lee Hall reservoir, Skiff's Creek reservoir, Harwood's Mill reservoir, Young's millpond and Causey's millpond, "the water sheds of said water works system and all distribution mains, pipes and rights of way therefor throughout the municipalities and counties where same are now located and the power plant or plants, filtration plant or plants, service meters, hydrants, fire plugs and all apparatus and equipment appurtenant to said system, owned by said companies or either of them, and to improve or to extend said system by the purchase of additional lands or the construction of additional reservoirs, power plants, filtration systems, water mains and such other improvements as may be necessary for the purpose of supplying pure potable water in adequate amounts to the consumers thereof; * * *."

for the collection of water rates in said counties and said municipalities, and for the levy and collection of taxes upon the taxable property of the city of Newport News, to provide for the payment of the principal and interest of said bonds; to provide for the establishment by the city council of a commission for the management of said water works plant and system; and upon consummation of the purchase to relieve the said water company from its duty to serve the public as such public service corporation.　　　(H B 341)

Approved March 25, 1926.

1. Be it enacted by the General Assembly of Virginia, That the city of Newport News is hereby authorized to purchase the water works, plant or system now owned and operated by the Newport News Light and Water Compnay, including auxiliary properties, owned by the Old Dominion Land Company, Virginia corporations, including the three reservoirs known as Lee Hall reservoir, Skiff's Creek reservoir, Harwoods' Mill reservoir, Young's millpond and Causey's millpond, the water shed of said water works system and all distribution mains, pipes and rights of way therefor throughout the municipality and counties where same are now located and the power plant or plants, filtration plant or plants, service meters, hydrants, fire plugs and all apparatus and equipment appurtenant to said system, owned by said companies or either of them and to improve or to extend said

The second section is most important in view of the questions raised in these cases. It reads:

"2. Upon the purchase of said water works plant by the city of Newport News, the said city shall continue to serve all corporations or persons now being supplied with water by said water works system in York county, James City county, Warwick county, Elizabeth City county, the city of Hampton, the town of Phoebus and the village of Kecoughtan. The city council of said city may authorize the extension of the water mains of said water works system so as to supply additional consumers of water in the territories aforesaid; and the said council may also contract with the United States to supply water .to Fort Eustis, Navy Mine Depot, Langley Aviation Field, Fortress Monroe and the National Soldiers' Home, upon such terms and conditions as may be agreed upon."

system by the purchase of additional lands or the construction of additional reservoirs, power plants, filtration systems, water mains and such other improvements as may be necessary for the purpose of supplying pure potable water in adequate amounts to the consumers thereof; to make reasonable rules and regulations for promoting the purity of its water supply and for protecting the same from pollution and for this purpose to exercise full police powers and sanitary patrol over all lands comprised within the limits of the water shed tributory to any such water supply wherever such lands may be located in this State; and to impose and enforce adequate penalties for the violation of any such rules and regulations.

2. Upon the purchase of said water works plant by the city of Newport News, the said city shall continue to serve all corporations or persons now being supplied with water by said water works system in York county, James City county, Warwick county, Elizabeth City county, the city of Hampton, the town of Phoebus and the village of Kecoughtan. The city council of said city may authorize the extension of the water mains of said water works system so as to supply additional consumers of water in the territories aforesaid; and the said council may also contract with the United States to supply water to Fort Eustis, Navy Mine Depot, Langley Aviation Field, Fortress Monroe and the National Soldiers' Home, upon such terms and conditions as may be agreed upon.

3. The city council of the city of Newport News is hereby authorized and empowered to purchase, lease or acquire by the exercise of the power of eminent domain in the manner provided by law, any additional lands or interest therein, within or without the city of Newport News that may be necessary for the operation of said water works plant or to protect the water from con-

The city may acquire by the exercise of the power of eminent domain, in the manner provided by law, any additional lands or interest therein within or without the city which may be necessary for the operation of the water works plant, or to protect the water from contamination, not exceeding in the aggregate 15,000 acres at any one time. If more land is acquired than is deemed necessary by the board of supervisors of any county in which any part of the land is situated, the board may file a petition in the circuit court of that county, requiring the city to show cause why it should not be required to dispose of any of its property held for water shed purposes because unnecessary therefor.

The fourth section provides:

"4. The proceeds of any such sale, lease or other conveyance of any such property belonging or appertaining

tamination, not, however, to exceed in the aggregate, fifteen thousand acres at any one time, and the said council may, in its discretion, sell, lease or otherwise dispose of any lands, or other properties not necessary for the proper protection of its water supply and the proper operation of said water works plant and system, provided, however, that no sale, conveyance, or lease of any such real estate belonging to or appertaining to said water works plant or system shall be made until notice of its intention to sell, lease or otherwise dispose of said property, shall have been given to the citizens of Newport News, by publication once a week for four successive weeks in a newspaper, published in said city, prior to the final adoption of the ordinace authorizing said lease or conveyance. Provided, further, that the board of supervisors of any county in which a part of the land is situated may file a petition in the circuit court of said county to require the city of Newport News to show cause why it should not be required to dispose of its property held for water-shed purposes as being unnecessary for said purposes.

The Governor shall designate some judge remote from said city or county to hear and determine the case, and provide for the sale of any land held unnecessary, with right of appeal to any party to the cause.

4. The proceeds of any such sale, lease or other conveyance of any such property belonging or appertaining to the said water works plant shall be applied solely to the extension, betterments or renewals of said plant, water sheds, or system or to the retirement of the principal of any indebtness incurred or assumed by the city of Newport News under the provisions of this act in the purchase of said water works plant and system.

5. The city of Newport News shall have the power to charge and enforce the payment of reasonable rates for the supply of water to all consumers in the territories aforesaid, the proceeds whereof shall be applied solely to the operation, maintenance and nesessary extension of the water works plant and

to the said water works plant shall be applied solely to the extension, betterments or renewals of said plant, water sheds, or systems, or to the retirement of the principal of any indebtedness incurred or assumed by the city of Newport News under the provisions of this act in the purchase of said water works plant and system."

The city is given the right to charge and enforce the payment of reasonable rates for water supplied to consumers, and the proceeds thereof shall be applied solely to the operation, maintenance and necessary extension of the plant, and to the payment of bonds issued under the act, and it is provided that the city shall "succeed to and enjoy all the powers and rights and privileges appertaining thereto, now possessed by

system and to the payment of the bonds issued hereunder, and said city, in the operation of its said water works plant and system, shall succeed to and enjoy all the powers and rights and privileges appertaining thereto, now possessed by the Newport News Light and Water Company, and the Old Dominion Land Company within the territories aforesaid, and all rights, privileges and immunities allowed or granted by general law to cities purchasing or owning water supply plants or systems.

6. Upon the conveyance of said properties to said city and the assumption of the operation thereof by said city all duties and obligations of the said companies to serve the pubilc as such public service corporations shall cease and determine.

7. To provide funds for the purchase of said water works plant and system, the council of the city of Newport News is hereby authorized to issue bonds of said city of Newport News in accordance with section one hundred and twenty-seven-b of the Constitution of Virginia. Said bonds shall be authorized by an ordinance reciting the expediency of borrowing money by said city and the issuance of bonds therefor, the amount of said bonds, the maturities thereof, the maximum rate of interest to be paid thereon, and the purpose for which said bonds are to be issued and that said bonds are to be issued under the provisions of section one hundred and twenty-seven-b of the Constitution of Virginia, and this act, and that they shall not be included in determining the limitation of the power of said city to incur indebtedness for a period of five years from the date of the election at which said ordinance shall be submitted to the qualified voters of the said city, but that from and after five years from the date of said election, whenever and for so long as said water works system fails to produce sufficient revenue to pay for cost of operation and administration (including interest on bonds issued therefor and the cost of insurance against loss by injury to persons or property), and an annual amount to be covered into a sinking fund sufficient to pay at or be-

the Newport News Light and Water Company and the Old Dominion Land Company within the territories aforesaid, and all rights, privileges and immunities allowed or granted by general law to cities purchasing or owning water supply plants or systems."

The duties and obligations of the Newport News Light and Water Company as public service corporations are to cease and determine upon the conveyance of the properties to the city. Then section 7 provides for the issuance of bonds by the city of Newport News, in case the ordinance provided for such bonds is approved and ratified by a majority of the qualified voters voting at an election held for that purpose, in accordance with the general law. These bonds are made the general obligations of the city for which the full faith and credit of the city is irrevocably pledged, and in

---

fore maturity, all bonds issued on account of said water works plant, then all bonds issued on account of said water works plant then outstanding shall be included in determining the limitation of the power of said city to incur indebtedness. Said ordinance shall provide that it shall take effect when ratified by the vote of majority of the qualified voters of said city voting at an election held therein, notice of which election shall be given by publication in a newspaper published in the city of Newport News once a week for three successive weeks, the first publication to be not less than eighteen days prior to the date of said election. Said election, except as herein provided, shall be in conformity with the provisions of chapter one hundred and twenty-two (122) of the Code of Virginia applicable thereto.

8. The bonds issued under the provisions of this act shall be the general obligations of the city of Newport News, for which the full faith and credit of said city shall be irrevocably pledged, and in the event the income and revenues of said water works plant are insufficient to provide for the payment of the principal and interest of said bonds as the same become due and payable, then the council of said city shall levy annual taxes upon all the taxable property in said city sufficient to make good any deficiency in said revenues and to provide for the payment of the principal and interest of said bonds at maturity.

9. All bonds issued under the provisions of this act shall bear interest at a rate not exceeding six per centum per annum, payable annually or semi-annually, and shall be signed by the mayor of the city of Newport News, attested by the city clerk, and shall have the corporate seal of said city affixed, and shall become due and payable serially or otherwise, in not more than forty years from their date, and shall not be sold upon a basis which will cost the municipality more than six per centum interest per annum, and to be sold at public sale, notice of which shall be given by publication in a newspaper published in the city of Newport News and in a financial paper publish-

case the revenues from the plant are insufficient to provide for the payment of the principal and interest as the bonds become due and payable, then the city council is required to levy annual taxes upon the taxable property of the city for the payment thereof.

Section 14 of the act provides: "This act shall be construed as an additional grant of power to the city of Newport News supplementary to the general law of the State relating to the rights and privileges of cities purchasing or owning water supply plants or systems."

There are other elaborate provisions, for which we refer to the act itself and deem it unnecessary here to recite.

For clarification, it seems best to define the several issues here raised.

---

ed in the city of New York, not less than ten days prior to the date fixed for the sale, provided, however, that in its discretion, the city council may deliver bonds issued under the provisions of this act at par or better, in payment for the water works plant, authorized to be purchased hereunder.

10. The bonds issued under the provisions of this act may be either coupon bonds or registered bonds. If issued in coupon form, the coupons shall bear the fac-simile signatures of the mayor and city clerk. Coupon bonds in the discretion of the city council may be registerable as to principal only, or as to both principal and interest, on books to be kept by a registrar which may be either an official of the city of Newport News or a bank or trus-company, duly authorized to act as registrar by ordinance of the city council.

11. If it should be determined after the voting of bonds as herein authorized, that there are existing liens upon said water works plant and system which cannot be retired prior to the conveyance of said properties to the city, the city council in its discretion, may purchase said properties subject to said liens, and in that event, said liens shall constitute merely charges upon said properties payable out of the income and revenues thereof, and shall not be assumed by the city of Newport News; provided, however, that the city council, in its discretion, may deposit with a trustee or trustees, bonds authorized under the provisions of the ordinance aforesaid, to be issued by said trustee in exchange for bonds or other instruments secured by said liens upon such terms and conditions, as said city council may prescribe, but in no event at a cost higher than the par value of said bonds, but the deposit of said bonds with said trustees shall not be considered an issuance thereof, nor to constitute indebtedness of the city of Newport News, unless and until delivered by said trustees in exchange for bonds or instruments secured by the aforesaid liens as herein provided.

12. Any change in the offices of mayor and city clerk or in the seal of said city occuring between the date of their execution of said bonds and the date of delivery thereof, shall in no wise affect the validity of said bonds.

1. The city of Newport News claims absolute exemption from taxation on its water works property in the county of Warwick, basing this claim upon Constitution, section 183, and this contention the trial court sustained, the specific taxes involved being levied for the tax year 1927. This presents the chief, most important and far reaching question in the cases.

2. The Newport News Light and Water Company claims that the taxable year, as to it, began June 30, 1926, and that as it had conveyed the entire property to the city on that date, it was in no event liable for but one day's taxes, and that the payment of five months' taxes, from February 1 to June 30, had been illegally exacted of it. It claimed a refund of the amount erroneously paid. The trial court sustained this contention.

3. The Old Dominion Land Company claimed that it was only liable for taxes on the land which it conveyed to the city for the five months from February 1st to June 30th, and that it should be exonerated from the payment of its proportionate part of the current year's taxes from and after June 30, 1926; and their application for exoneration was granted.

*First:* As to the question raised and decided in favor of the city of Newport News.

13. The city council in its discretion may provide by ordinance for the establishment of a commission, the members of which may be selected in any manner designed by the council, which commission shall be vested with such powers as to the management of said water works system, including the fixing of rates therefor, as said council may deem proper.

14. This act shall be construed as an additional grant of power to the city of Newport News, supplementary to the general law of the State relating to the rights and privileges of cities purchasing or owning water supply plants or systems.

15. An emergency existing in the immediate necessity of the city of Newport News acquiring a water plant adequate to the present and future requirements of the said city, this act shall take effect immediately.

■ It is, of course, generally true that property owned by a city and used for public purposes is exempt from taxation. The general rule is that while all property is taxable, a recognized exception thereto is that public property, devoted to public purposes, is not taxable.

■ There is an elaborate discussion of the question in the briefs and many cases are cited. It must be conceded, however, that Constitution, section 183, controls the question in this State. That section provides affirmatively that certain property owned by a city shall be exempt from taxation, but in express terms limits that exemption. So much of the section as it is necessary to quote reads: "The following property and no other shall be exempt from taxation, State, and local:" Then follows sub-section (a) which provides that "Property directly or indirectly owned by the State, however held, and property lawfully owned and held by counties, cities, towns or school districts, used wholly and exclusively for county, city, town, or public school purposes," shall be exempt from taxation, State and local. There is other language which expressly emphasizes and defines other limitations upon exempted property by providing that "whenever any building or land, or part thereof, mentioned in this section and not belonging to the State, shall be leased or shall be a source of revenue or profit, all of such buildings and land shall be liable to taxation as other land and buildings in the same county, city, or town * * *."

By this section (183) the city is bound, and it is only thereunder that it can claim the exemption.

■ After showing that the property is charged with a public trust, it is contended with great earnestness that this is conclusive.

This contention seems to be confidently based upon the case of *Commonwealth* v. *Richmond*, 116 Va. 69, 81 S. E. 69, 72, L. R. A. 1915A, 1118. It appears from that case that the Commonwealth undertook to tax the city of Richmond upon certain properties and utilities owned by the city, including an auditorium building, water works, gas works and sewerage system, and certain grounds and buildings owned and used by the city for the use and operation of said properties and utilities. The case is quite pertinent here so far as it relates to the water works. The Commonwealth claimed the right to tax this property because it was shown that water was supplied to certain persons and corporations who lived outside of the city of Richmond, to whom the city owed no duty. It was shown that for the year involved, 1911, the total receipts for water were $254,122.48, while the city spent for maintenance, mains, meters, etc., $181,600.22, leaving a net income of $72,522.26, not taking into consideration the interest on the outstanding indebtedness of the city chargeable against the water works, which interest during the year amounted to $54,800.00, leaving a net income of only $27,722.00, but if four per cent were charged on the whole cost of the works to and including that year, there would be a considerable annual deficit by reason of the operation of the water system. It appeared that water had been supplied to certain consumers in Barton Heights, which suburban territory had since been taken into the city; that water had been furnished to the Richmond Locomotive Works, a branch of the American Locomotive Works, its large and extensive plant being located adjacent to the territorial limits of the

city; that water had also been furnished to the repair shops of the Chesapeake and Ohio railroad, the Seaboard Air Line railway and to M. T. Cottrell, living on the north side of Broad street adjacent to the city limits, and to a few others under like conditions. The aggregate amount of revenue derived from thus furnishing water to nonresidents and industrial plants outside of the city limits for the year 1911 amounted to the sum of $6,455.28. The court in this connection said: "To what extent nonresidents of the city have been furnished with gas does not clearly appear, but it does appear that it was to a less extent than was the case as to water furnished to consumers beyond the city's corporate limits. In comparison with the gross revenue from the city's water works for the year 1911, $254,122.48, the sum of $6,455.28 received from consumers outside of the city limits for the same year would seem to us *de minimis* and as not requiring further consideration."

In the brief for the city here, much emphasis is placed upon the fact that the city holds the water works property as a public trust, and language from Lewis on Eminent Domain, section 165, note, which has been often cited, is quoted as conclusive of the question here. That quotation is: "The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use which cannot be gainsaid or denied, or withdrawn by the owner."

That language and citation primarily relate to the right of eminent domain—*e. g.*, in cases like *Plecker* v. *Rhodes*, 30 Gratt. (71 Va.) 798; *Fallsburg, etc., Co.* v. *Alexander*, 101 Va. 107, 43 S. E. 194, 61 L. R. A.

129, 99 Am. St. Rep. 855; and *Dice* v. *Sherman*, 107 Va. 424, 59 S. E. 388. These were all cases in which the question was whether private property could be condemned for a use alleged to be private under the constitutional authority to condemn private property for public use. That test applies as well to public service corporations as to cities but does not exempt the property employed by the public utilities from taxation.

The case of *Knoxville* v. *Park City*, 130 Tenn. 627, 172 S. W. 286, L. R. A. 1915D, 1103, is helpful. Several cases are cited which support the conclusion. The Knoxville Water Company supplied the city of Knoxville and Park City, about 300 feet apart, with water. Under legislative authority, the city of Knoxville acquired the entire system and assumed the contract then in existence between the water company and Park City. The plant within the territorial limits of Park City was not necessary to that part of the system which supplied Knoxville, but was used to supply Park City and its inhabitants. Park City undertook to tax so much of the plant as lay within its territorial limits. The city of Knoxville, as owner, claimed exemption under a constitutional provision which exempted property held by a city "and used exclusively for public or corporation purposes." Under these facts, and construing this constitutional provision, the city of Knoxville was held liable for taxes upon its property located in Park City which was used to supply Park City and its inhabitants but was not used to supply Knoxville and its people.

It may be freely conceded that the city of Newport News holds and must administer this property as a public trust, and that its mandatory duty is to respect the public interest therein. It should be observed, however, that while the General Assembly had the

power to impose the duty, it did not undertake to do so without the consent of the city. The city authorities and the people of the city at a popular election have voluntarily assumed the duties imposed. Certainly then the city holds the property as a public trust, charged with duties which it must perform. All of this, however, while it may have relation to the precise question here presented, is not decisive. That question is whether or not the property is liable to taxation. All property certainly is (Constitution, section 168), unless exempted by the self-executing provisions of the Constitution, section 183.

The record shows that as authorized by the act approved March 25, 1926, the city of Newport News has acquired the property, operates and intends to continue the water supply business outside of the city in the counties of Warwick, Elizabeth City, the city of Hampton, the towns of Phoebus and Buckroe Beach, numerous suburban settlements, and to supply water to United States government camps, forts and stations, and to sell water to dealers for the use of ships in the harbors of the James river and Hampton Roads. The act also authorizes the extension of the business into the counties of York and James City.

For the year 1927, the revenue paid to the city of Newport News for water by consumers in Warwick county, including fire hydrants, was $14,126.42; for water in Elizabeth City county, outside of Hampton, including private consumers, public schools and other county uses, was $42,387.48; for water in the city of Hampton, including fire hydrants, $38,696.60; by consumers in the town of Phoebus and for fire hydrants, $16,797.08; a total of $112,007.68 for all water sold outside of the corporate limits of the city during 1927. The total revenue received by the city for all water

distributed in 1927, outside and inside of the corporate limits of the city of Newport News, amounted to $345,589.76. Of this amount $112,007.68 was received from the sale of water in the city of Hampton, other towns and to consumers living outside of the corporate limits of the city of Newport News. The total revenue for water supplied inside of the corporate limits of the city, which included that supplied to large industrial and commercial enterprises, as distinguished from water supplied for domestic uses, amounted to more than $233,000.00, in which sum is included a substantial amount which was paid to the city by those who are engaged in the business of buyimg water from the city in large quantities and selling it at a profit outside of the city to ships in the harbors of James river and Hamptom Roads.

It appears then that more than one-third of the total revenue was derived from water distributed outside of the city to persons outside of the city for their use. After setting aside a proper amount for depreciation, estimated at $75,354.20 for the preceding period of eightteen months ending December 31, 1927, the revenue, after deducting operating expenses, showed a gross profit in excess of $99,000.00. Out of this profit $29,000.00 was used to retire twenty-nine serial bonds of $1,000.00 each, being a part of the purchase price of the property; $60,844.44 was expended for capital additions to the system, leaving a net balance over and above the capital additions of $10,047.53. It is claimed in the latest brief filed for the city that there have been additional expenditures and that there has been no profit to the city, but it is conceded that this is not shown by the record.

The facts certainly distinguish this case from *Commonwealth* v. *City of Richmond, supra.* It is un-

doubtedly true that a city may supply limited quantities of water to persons outside of the city as a mere incident to the enterprise as a whole, and certainly when the total amount is as small as that shown in the *Richmond City Case* it may be treated as inconsequential, and the property will nevertheless be exempt from taxation as devoted wholly to municipal purposes. We do not intend by anything appearing in this opinion to impinge in the slightest degree upon that reasonable construction of the section (183). Cities and towns owning a water supply acquired for the public purposes of such cities may thus dispose of such surplus production. *Mount Jackson* v. *Nelson*, 151 Va. 407, 145 S. E. 355. It is not only permissible but proper to do so, so long as this does not prevent the full discharge of its duties to its own citizens, and this alone will not defeat the exemption.

All the considerations which moved the trial court and which are so earnestly urged by the learned counsel for the city, as to the wisdom of permitting the the city to control and distribute the limited water supply of the territory involved, may be freely conceded. Unquestionably it seems far better that the city of Newport News should own this water supply and operate the plant for the benefit of all the people of the city as well as of those living in the contiguous territory than it should be owned and controlled by an independent public service corporation, or by several corporations. That the General Assembly recognized this in the passage of the act here involved seems to be apparent. These considerations, however, do not determine the precise question.

We get little assistance from reviewing the many cases which are cited, and considering the conflicts of opinion which in some instances appear. These Vir-

ginia constitutional provisions have been considered by this court in these cases: *Commonwealth* v. *Hampton Institute*, 106 Va. 614, 56 S. E. 594; *Commonwealth* v. *Lynchburg Young Men's Christian Association*, 115 Va. 745, 80 S. E. 589, 50 L. R. A. (N. S.) 1197; *Hollywood Cemetery Co.* v. *Commonwealth*, 123 Va. 106, 96 S. E. 207; *Commonwealth* v. *Smallwood Memorial Institute*, 124 Va. 142, 97 S. E. 805.

We do not deem it necessary to undertake to interpret these cases. Each seems to enforce sound conclusions of law under the facts there presented, which need no further elaboration or explanation.

It is frankly conceded in the briefs filed by the attorneys for the city that "the right of exemption here claimed must ultimately rest upon the construction of section 183 of the Constitution." Adverting again to that section, we find that "property lawfully owned and held by counties, cities, towns or school districts, used wholly and exclusively for county, city, town or public school purposes," is thereby exempted from taxation, and we also find that "whenever any building or land, or part thereof, mentioned in this section, and not belonging to the State, shall be leased, or shall be a source of revenue or profit, all of such bulidings and land shall be liable to taxation as other land and buildings in the same county, city or town."

The case seems to be argued as though the language means that whenever property is owned by any city and is used for any county, city, town or public school purposes, it shall be exempt from taxation, and this because the purpose is public. This construction, however, does violence to the language, ignores its import and fails to meet the true issue. A city has no public duty to perform to the citizens of counties, other cities, other towns, or other school districts. The lan-

guage means that when a county holds property for county purposes, or a city for city purposes, or a town for town purposes, or a school district for school purposes, and the specific property is used for any of their distinct and several public purposes, and there is no other substantial use of it for private profit, then it is exempt from taxation. Manifestly, it does not mean that merely because the property is owned by a city it is therefore exempt from taxation. This is true of property owned by the Commonwealth, but untrue of property owned by a city, for this depends upon the use to which it is devoted. If it be used not only for its local city purposes but also for other public purposes in which the city has no interest or concern, which is neither incidental nor significant, then the property so used is liable to taxation. These words, "used wholly and exclusively," have been and will be liberally construed, but this construction cannot be so extended as to ignore and disregard them. If the outside use be incidental or the revenue therefrom so small as to be negligble, the property is still exempt from taxation, but if the outside use is essential, *i. e.*, imposed as an inherent duty upon the city as the owner of the property, and in addition the revenue derived is substantial, then the property is not exempt from taxation. The duty to supply the consumers outside of the city, so far from being incidental or subsidary to any dominant use by the city for its own citizens, is by the act made one of the main and primary duties of the city equally imperative and binding. It is also significant that the framers of the Constitution, for the purpose of emphasizing and clarifying the previous language used in section 183 (a) and other sub-sections, repeat the same idea by expressly providing that where the property otherwise exempt is used as a source of revenue or profit (meaning sub-

stantial profit), then all of the buildings and land so used shall be liable to taxation.

■ Should the construction which is contended for by the city here be adopted, it would nullify these constitutional provisions. Not all property owned by a city and used for its public purposes is exempt, but only that which the section defines as that used wholly and exclusively for city purposes. It is not difficult to conceive of a small municipality as the owner of a very large water supply, under an act similar to that here involved, so operating it that the water supplied to the municipal owner and its citizens might itself be a mere incident to the greater external business.

It may be true, also, that if such property is not used as a unified system, and can be segregated so that the part of the property which is exempt from taxation can be distinguished from that which is not exempt, within the limits prescribed by the Constitution, then a different question which is not presented by this record may possibly be raised and so is not decided.

Constitution, section 183 (g), was amended June 19, 1928 (see Acts 1928, pages 692, 693, chapter 205), so that now the General Assembly may provide for the partial taxation of property not exclusively used for the purposes named in the section.

It is asserted with much emphasis that under this act private gain is prohibited to the city. To this we cannot agree. While section 5 provides that the rates to be charged to the consumer in the territory outside of the city shall be applied solely to the operation, maintenance and necessary extension of the system, and to the payment of bonds issued for the purpose of the plant, section 8 provides that these bonds shall be the general obligations of the city of Newport News, for

which the full faith and credit of the city shall be irrevocably pledged, and that if the profits from the operation of the plant prove to be insufficient to pay the principal and interest of the bonds when payable, the city shall levy annual taxes upon the taxable property in the city sufficient to provide for their payment at maturity. Then when the city has, either from the profits of operation or from taxes so levied, paid these bonds, whose will the property be? The answer to this question is obvious. The city as the owner of the valuable plant, then released from the purchase money lien thereon, will either with or without additional legislation still be entitled to charge reasonable rates and to all the profits arising from its operation. Therefore, it cannot be said that private gain is prohibited by the act. If the operations in the future are as profitable as they seem to have been in the past, the private gain of the city will continue to be substantial.

It is insisted, and rightly, that the city is only discharging the duty which the act imposes upon it, and that the General Assembly has plenary power.

In this connection it is said that the liability of the the city to taxation upon the water works system must rest upon the answers to be given to two questions: (1) Is the water system now owned by the city used in strict conformity with the law under which it was purchased? and (2) Is the property owned by the city necessary for the full performance of the trust imposed upon it under the law?

It seems to be claimed that as both of these questions should be answered affirmatively, it follows therefrom that the claim of exemption from taxation must be determined favorably to the city.

We can fully agree with the premises, but we disagree with the conclusion. We disagree because the act un-

der which the city is performing its duty has no relation to the question of taxation, and does not refer thereto. That question is determined by Constitution, section 183. Our conclusion is that the property is liable to taxation because it is not used either wholly and exclusively for the public purposes of the city of Newport News, and that, having the right to charge reasonable rates, it should be a source of revenue and profit to the city of Newport News, a very substantial part of such profit being derived from the consumers of water outside of the city of Newport News, to whom the city owes no other duty than that which it assumed under the act of 1926. It may prove to be very difficult to determine in such cases whether a particular property or item of property is or is not liable to taxation. The constitutional provisions have been and should always be liberally construed to effect their purpose. They should not, however, be so liberally construed as to defeat their manifest purpose. We do not mean to intimate that as the owner of water works, a municipality may not, as a mere incident to its business, supply relatively limited quantities of water to persons outside of its territorial limits without subjecting its property to taxation. We do mean to say that under the facts of this case, the supplying of water by the city of Newport News to a large number of consumers in Warwick county and Elizabeth City county, at reasonable rates, with the right to extend its mains to supply water to the citizens of York and James City counties, cannot be held to be a mere incident to supplying water to its own citizens, without disregarding the manifest import of Constitution, section 183.

Our conclusion, then, is that the order of the trial court exempting the property from taxation by the county of Warwick for the tax year 1927 is erroneous, and therefore it will be reversed.

*Second.* The trial court sustained the contention of the Newport News Light and Water Works Company that it was entitled to have its payment of five months taxes covering the period from February 1 to June 30, 1926, refunded, holding that the tax year as to that company began June 30, 1926, and this presents another distinct issue.

In order to understand this question it is necessary to consider the act "for the relief of all taxpayers in the State of Virginia whose property has been heretofore taken or acquired by the State of Virginia or any county or municipality thereof, * *" (Acts 1922, page 733, chapter 421; Code, section 2392-c), which is copied in the margin.† That act, in general terms, among other

†. Section 2392-c. Relief of taxpayers whose property has been acquired by the State or any county or city.

All taxpayers of this State whose property, or any portion thereof, has been heretofore acquired or taken in any manner whatsoever by the State of Virginia, or any county or municipality thereof, shall be relieved from the payment of taxes and levies on such property as has been or shall be so taken or acquired for that portion of the year in which said proprety was or shall be so taken or acquired, from and after the date upon which the title was or shall be vested in the said State of Virginia, or any county or municipality thereof; and the county treasurers, as to property situated in the counties, and the city treasurers and the city collectors, as to property situated in the cities, so taken or acquired, shall, so long as they are authorized by law to collect taxes in their hands, receive from and receipt to the original owner, his personal representative, heirs, successors or assigns, of the property so taken by the State of Virginia, or any county or municipality thereof, for his proportionate part of the taxes and levies for such year at the time he makes his returns of land and lots improperly assessed, as required by law, the proportional part of the taxes and levies exonerated from taxation for any such year, indicating on the margin of the list the date on which the property was so acquired and whether so acquired by the State of Virginia or by any county or municipality thereof. Said list, when approved by the proper authorities, shall be considered as a credit to any such treasurer or collector in the settlement of the accounts for the year. The clerk of the court of the county or city in which is recorded the transfer of title to said property shall furnish a certificate to the Auditor of Public Accounts and to the county or city treasurer, or city collector, showing the quantity of land so taken or acquired, and whether by the State of Virginia or any county or municipality thereof, the name of the former owner, and a description of the property and the district or ward in which the property is situated, also the date of the recordation of the deed or order by which such property was taken or acquired by the State of Virginia or any county or municipality thereof, as shown by the records in the office, which certificate shall be sufficient evidence to the county and city treasurers and city collectors to authorize them to receive them and prorate the taxes and levies as herein authorized.

things, provides that taxpayers whose property, or any portion thereof, has been acquired or taken by any municipality, shall be relieved from the payment of taxes and levies on such property for that portion of the year in which the property was taken or acquired from and after the date upon which the title should be vested in the municipality.

It appears that the deed for the property of the water company was executed by the officials of that company and by the officials of the city on the afternoon of June 30, 1926; that on the same date it was partially executed by the old Dominion Land Company. The president and vice-president of that company, however, were both away from the city of Newport News, and the execution of the deed by the vice-president of the Old Dominion Land Company was completed in the city of New York, and delivered July 1, 1926. The possession of the property conveyed thereby was delivered at midnight June 30th.

Any such taxpayers whose property has been so taken heretofore within three years prior to the passage of this act who shall have paid his taxes and levies for the whole year shall be entitled to recover such proportion of said taxes as he would be relieved from paying under the terms of this act on any property that has been taken or acquired heretofore by the State of Virginia, or any county or municipality thereof, in the same manner as provided by law for the correction of erroneous assessments and refunding taxes erroneously charged; provided, however, that application therefor, as provided by law, shall be made to the appropriate court on or before September first, nineteen hundred and twenty-three; and any such taxpayer who has not paid the taxes or levies on such property so taken or acquired for any year prior to nineteen hundred and twenty-two shall be entitled to the proration of said taxes or levies and the relief as herein provided, upon application to the proper court, in the manner as provided by law for the correction of erroneous assessments and refunding taxes erroneously charged, and shall also be relieved of interest and penalties therefor, provided he shall make application to said court on or before the first day of September, nineteen hundred and twenty-three.

And any such taxpayer, as to property acquired by the State of Virginia, or any county or municipality thereof, subsequent to January first, nineteen hundred and twenty-two, who shall fail to have his taxes prorated by the county or city treasurer or city collector, as above provided, shall be entitled to apply to the appropriate court for proration of said taxes, as herein provided, in the same manner and within the same time as provided by law for the correction of erroneous assessments and refunding taxes erroneously charged; provided, however, that in such proceedings such taxpayer shall be entitled to relief of interest and penalties only as to the proprotionate part of the said property so taken or acquired by the State of Virginia, or any county or municipality thereof. (1922, page 733.

 It is argued that the act violates certain sections of the Constitution—that is, sections 63, 64, 168 and 183.

Section 63 prohibits the General Assembly from the passage of local, special and private laws in certain cases. The answer to this contention is that this is not a local, special or private law, but a general law applying to all persons in the Commonwealth similarly situated, and within the designated class. *Strawberry Hill Corp.* v. *Starbuck*, 124 Va. 71, 97 S. E. 362; *Reaves Warehouse Corp.* v. *Commonwealth*, 141 Va. 194, 126 S. E. 87.

Section 64 prohibits general or special laws surrendering or suspending the right and power of the State or any political sub-division thereof to tax corporations and corporate property. Section 168 prescribes the general rule, which requires all property to be taxed, and that taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax.

Section 183 refers to exemptions from taxation.

We think it sufficient to say that the presumption in favor of the constitutionality of acts of the General Assembly is a sufficient reply to these contentions. The question as to whether the city of Newport News is exempt from taxation is one in which the Newport News Light and Water Company has no interest, and this subject has been discussed in the previous part of this opinion.

 The trial judge, Hon. H. B. Gregory, rightly held that the act is not a tax exemption statute. In this connection he quite aptly said:

"Section 2392-c of the Code is not a tax exemption statute. The effect of this statute is to permit the proration of taxes between the State and municipality on the one hand and the prior owner on the other hand in all cases

where the State or municipality acquires such property. The general rule is that such proration is not allowed and when the assessment has been made the then owner and the property become liable for a whole year's taxes. This statute creates an exception to the general rule and its provisions render it mandatory on the tax officials to prorate the tax on such properties which are acquired by the State or other municipality. This act does no violence to the Constitution.

"Sections 168 and 183 of the Constitution do not prohibit the legislature from passing an act permitting the proration of taxes in cases like the one here considered. The prohibition found in the Constitution applies only to exemptions.

"Taxes are assessed against property and the owner for and in consideration of the use and enjoyment of property by the owner and in cases where the owner has been deprived of the use and enjoyment of his property by the State or municipality, or the property has been acquired by the State or municipality, it was competent for the legislature to provide that he should not be required to pay taxes when and after his use and enjoyment have ceased."

If the property is, under the Constitution, exempt from taxation while thereafter held by the grantee, this is an exemption accorded by the Constitution, which is recognized (not granted) by the act.

The section accords with Acts 1918, page 412, chapter 234, section 2392-b, which apportions and relieves grantors of a proportionate part of taxes for the year in which property has been sold to the United States. While that act was adopted in 1918, so far as we know its validity has not been questioned.

We do not mean to determine the constitutionality of the act in every respect in which it may be questioned. So far, however, as it relieves the grantors

in such deeds of taxes for the unexpired portion of the tax year, it is a valid exercise of the legislative power. We know of no sufficient reason for holding that this exceeds the power of the General Assembly. No legislative act should be lightly condemned as unconstitutional. Those who claim that it is must bear the burden of demonstrating it, and certainly all doubts should be resolved in favor of the constitutionality of the act in question.

The second claim of the company must be considered. Having conveyed the property as of June 30, 1926, and paid five months taxes upon the property—that is, for the period between February 1st and June 30th, its claim to have the amount so paid refunded was sustained by the trial court—this upon the holding that the tax year, as to the light and water company, began, not on February 1, 1926, but on June 30, 1926. This, of course, necessitates the determination of the date upon which the tax year began.

It is certainly true that until the adoption of the act of 1910 (Acts 1910, page 90, chapter 61), the tax year as to all property for many years began on the 1st day of February and ended on the 31st day of the following January. Acts 1874-75, chapter 239, page 281; Acts 1875-76, page 161; Acts 1902-1904, page 155, chapter 148.

That February 1 was the beginning of the tax year was held in *Tiller* v. *Excelsior Coal Co.*, 110 Va. 151, 65 S. E. 507, and the question was entirely removed from the forum of debate by the Code of 1919, section 2270, which provided: "The beginning of the tax year for the assessment of taxes on real estate shall be February 1st, and the owner of real estate on that day shall be assessed for the taxes for the year next ensuing." In 1910 (Acts 1910, page 90, chapter 61), the General Assembly

changed the method of assessing the property owned by corporations engaged in the business of furnishing water, heat, light and power. Section $36\frac{1}{4}$ of the tax bill required all such corporations to report to the State Corporation Commission their real and personal property of every description in this State which they owned on the 30th day of June preceding the report, which was required to be made on or before September 1st of each year. The claim that the tax year was changed from February 1st to June 30th is based entirely upon this act.

It seems to us that the contention is manifestly untenable. There is no word in the act of 1910 which can possibly be construed to indicate a purpose on the part of the General Assembly to change the tax year, except that which requires that inventory of the property should be made of June 30, and reports made on or before September 1. For the current year in which the act of 1910 was passed, the assessments theretofore required to be made by the local taxing authorities were left undisturbed, and so when the commission came to assess taxes for 1911, had the act been construed to change the beginning of the tax year from February 1st to June 30th, this would either have imposed double taxation for the period beginning June 30, 1910, to February 1, 1911, or have relieved the companies of all taxation from February 1 to June 30, 1911. Should we hold that the first assessment made in 1911 by the commission was for the year ending June 30, 1911, this would result in taxing the same property twice for the seven months from June 30, 1910, to February 1, 1911, and should we hold that this first assessment by the commission was for the year beginning June 30, 1911, this would result in relieving the property from taxation for the five months therein, February 1, 1911, to June 30, 1911.

Had the General Assembly intended the act to effect either of these results, some intimation of such a purpose would certainly have been indicated in the language used. In the absence of such language, it seems to us manifest that there was no intention to change the beginning or duration of the tax year, and that the only intention was that which was expressed, namely, to change the method of assessing the property and the date during the taxable year upon which the inventory of the property should be taken. The question is now determined by the act of 1926 (Acts 1926, chapter 160, page 288), which provides expressly that the tax year shall begin the first day of January of each year and end on the 31st day of December of each year. There is no qualification of this language, and it applies to all taxpayers. This now appears in the Tax Code of 1928, section 228.

Our conclusion, then, is that the trial court erred in its order of December 7, 1928, in directing the treasurer of Warwick county to refund any part of the taxes which had been paid by the water company covering the period of its ownership of the property from the 1st day of February to the 30th day of June, 1926. The order will, therefore, be reversed in this respect. There is no error in so much of the order as exonerates the Newport News Light and Water Company from the payment of additional taxes for that tax year.

*Third.* The third issue arose upon the application of the Old Dominion Land Company against the county of Warwick for exoneration from taxes for the year 1926 from and after June 30, 1926, when the property was conveyed to the city of Newport News. The land company relied upon the same act which we referred to. Michie's Code, section 2392-c; Acts 1922, page 733, chapter 421. This company makes no claim that the taxable year had been changed

so far as the assessment of its property was concerned. The tax year as to the property of the land company began February 1, 1926. It paid the proportionate part of the taxes which accrued up to June 30th, and claimed that it was entitled to exoneration for the residue of the tax year—that is, for seven months until February 1, 1927.

Its prayer was allowed, and for the reasons which we have already stated, there is no error in this conclusion. This recital, however, appears in the order : "It further appearing to the court that all of the said property assessed as aforesaid for county and district taxes for the year 1926, is property lawfully acquired and owned by the city of Newport News, a municipal corporation, and is by the said city used wholly and exclusively for city purposes in furnishing water to its citizens and inhabitants and to such persons residing outside the corporate limits of said city as the said city is by law required to serve with water, and that the compensation received by said city for water so furnished can be, and is solely, applied by said city to the operation, maintenance and necessary extension of the water works plant and system and to the payment of the bonds issued by the said city for the purchase of the said water works; * *," and this is followed by formal recitals which it is unnecessary to repeat.

For the reasons which we have heretofore indicated in this opinion, we differ with the learned trial judge in his conclusion of fact, that the property is used wholly and exclusively for city purposes and hence became exempt from taxation after the property was acquired by the city. The precise question which arises, namely, whether the city is liable for the taxation for the residue of the taxable year of 1926, is, we believe, not pre-

sented by this record. The act which exonerates the grantor in such deeds from the payment of taxes after the same has been acquired by the city, is, as we have indicated in our opinion, a lawful exercise of legislative power. If, however, the purpose of the act was to exempt the property from taxation after it had been acquired by the city, then in so far as it contravenes section 183 of the Constitution, it is invalid and exceeds the power of the General Assembly. When property-is conveyed to the United States or to the State of Virginia, it is from and after that date exempt from taxation, and if conveyed to a municipality and is wholly and exclusively used for its public purposes, it is also exempt from taxation from and after the date it is acquired and so used. The act is valid in so far as it recognizes these constitutional exemptions. *State* v. *Locke*, 29 N. M. 148, 219 Pac. 790, 30 A. L. R. 407, note, Ann. Cas. 1914A, 161, note. It cannot, however, be construed to add to the constitutional exemptions, for this exceeds the legislative power, as we have concluded. This question is not involved in the motion of the land company against the county of Warwick for its exoneration from taxation after it had conveyed the property to the city. This precise issue is not raised by the record. We, therefore, reserve our opinion as to whether or not the taxes levied upon this property for the year beginning February 1, 1926, accruing between June 30, 1926, and February 1, 1927, constitute a lien upon the property conveyed, or a valid obligation due to the county, which can now be enforced.

Referring to the record as a whole, the orders are reversed, except so far as they exonerate the Newport News Light and Water Company and the Old Dominion Land Company from the payment of taxes from

and after June 30, 1926, when the property was conveyed to the city of Newport News. The case is remanded to the Circuit Court of Warwick county for such further orders as may prove to be necessary for the preservation of the rights of the parties, in accordance with the views herein expressed.

*Partly reversed and remanded.*